May it please the Court, my name is Lawrence Rosenfeld. I am the attorney for Appellant JDA Software. Did you raise your voice a little? We're having a little trouble hearing you. I certainly will. Lawrence Rosenfeld for Appellant JDA Software. The principal issue I'd like to address here this morning is whether the district court misapplied the likelihood of success or alternatively the serious questions prong of the preliminary injunction test by requiring a showing of, quote, actual competition in order to grant a preliminary injunction against the potential misuse of confidential information under circumstances where Mr. Bissett was clearly a recipient of competitively valuable information and joined a direct competitor of JDA in a similar position. What's indisputable on this record is that Mr. Bissett was a JDA customer service or customer relationship manager. He signed a confidentiality agreement that in the course of acknowledging that he was a recipient of JDA's confidential information regarding its software applications, methodologies, designs, marketing plans, among other things. There can be no question that JDA has a legitimate protectable interest in its confidential, competitively sensitive information, and there can be no dispute that Mr. Bissett agreed in the course of signing that confidentiality agreement not to disclose the information nor for a year after he left JDA to accept a position with any of its six principal software competitors, one of whom was SAP, in any of seven market segments in which JDA and that competitor SAP compete, including the retail and manufacturing segments. Nor can there be any dispute that immediately upon leaving JDA, Mr. Bissett took a position that squarely violated the terms of the covenant. But the district court, notwithstanding all of this, did not grant JDA preliminary injunctive relief because it said there was no showing, and according to the Court, we find there is insufficient evidence to suggest that Bissett is actually competing with JDA, and thus said the Court, there was no showing of what it called, quote, real concrete harm. Now, let me mention that I believe the question of whether or not a non-compete covenant has actually been breached is a mixed question of fact in law and is viewable de novo, but the question of whether or not that was the appropriate test to apply in determining whether or not an injunction should issue is purely a question of law, because given the similarity of the positions that Mr. Bissett occupied at ManuGistics and JDA on the one hand and at SAP on the other, the Court erred as a matter of law in requiring an act of actual competition for an injunction such as, for example, an act of customer solicitation or an act of actual disclosure of confidential information. In requiring that that be shown, that there be an act of actual competition, the Court erred. And in this regard, I call the Court's attention to the cases cited at page 23 of our opening brief, most particularly the Uncle Bees v. O'Rourke case, Minnesota Mining v. Frankville, and FMC v. Varco. In each of those cases, the Court said that in granting a preliminary injunction an employee working for a competitor in a similar position, and now quoting from Frankville, quote, "...cannot be expected to compartmentalize his knowledge so his decisions and disclosures are not tainted by information he has prohibited from using." That's very, very different from having to show actual competition. I would also, along the same lines, call the Court's attention to the Bedmark v. Kelly case cited throughout our brief, which stands for the same proposition. That is, none of the cases that I've mentioned, that in no case that Appellee has cited, the Court require a showing of actual competition as a predicate to granting injunctive relief where there was a legitimate concern about the disclosure of competitively sensitive information to a competing company for which our former employee went to work. And that Mr. Bissett's former and current positions are similar, indeed, they are strikingly similar, cannot be disputed on this record. During the course of the litigation, Mr. Bissett and his counsel described his job responsibilities at SAP as a consulting engagement manager, as opposed to what he was at JDA, which was a customer relationship manager, pretty similar titles. They described his position at SAP as selling software implementation services in the retail industry, managing SAP implementation projects in the retail industry, supporting the consulting services for the implementation of SAP products for SAP's retail customers. What did he do for JDA? As a customer relationship manager, and this is now from the Fowler Declaration, which is excerpt of Record 26, Exhibit 2, Mr. Bissett supported implementation efforts, and over an 18-month period, he, quote, "...led activities on the ground at Albertsons, a retail grocer, a retail customer, in a software implementation project. He managed the scope, project planning, resource planning, and high-level solutions planning at JDA on behalf of JDA, or ManUgistics, its predecessor." And beyond this, as Mr. Patess testified in his declaration, excerpt of Record 26, Exhibit 3, Mr. Bissett was the contact person for customer software sales and implementation. That's what he's doing at SAP. That's what this record shows. And if, in fact, the positions are remarkably similar, and if, in fact, Mr. Bissett has competitively sensitive information, which the record shows that he does, and I would refer the Court in particular to paragraph 6 of the Fowler Declaration, then the Court should not have made an inquiry as to whether there was actual competition. The Court should have concluded, based on Uncle B's and Minnesota Mining and FMC v. Barco and Bedmart v. Kelly, that that was a sufficient basis upon which either to determine there was a likelihood of success or, alternatively, that serious questions going to the merits had been raised. And along those lines, I would also point out to the Court that in Excerpt of Record 11, Exhibit A, this is Mr. Bissett's own declaration. He says that he has been a business software consultant for 10 years, and that if an injunction were issued, it would be a hardship because he would no longer be able to remain in that profession. But what he's saying is, I was a business software consultant at JDA, and now I want to be a business software consultant for its direct competitor, SAP, and I have all of this confidential information that I might inevitably, intentionally or even inadvertently, disclose. And for those reasons, Your Honors, the Court erred in making the determination that unless an actual act of competition was shown, we were not entitled to preliminary injunctive. Robertson, That's certainly an important part of the judge's ruling that it's – that it's written anyway, but he says they're not in competition and there's no evidence of breach of confidentiality. And I – couldn't you read that as saying that if either one were shown, then my ruling might be different? Well, I'm not sure that the Court goes so far as to say that – well, he says there's no breach of the confidentiality portion of Mr. Bissett's agreement. And we – and he's correct in that. But remember, Your Honor, that all we would have to do to succeed to get the injunction is to show either a breach of the confidentiality covenant or a breach of the noncompete covenant. Right. And in order to show a breach of the noncompete covenant, we have to show no more than that, at least in order to establish a reasonable likelihood of success or that we've raised serious questions, we have to show no more than that either – than that he had the confidential information and that he's in a sufficiently comparable position such that there is an inevitable risk of disclosure or alternatively there's a potential for intentional disclosure to our competitive disadvantage or even an inadvertent disclosure of that information that would place SAP at a competitive advantage vis-à-vis JDA that it does not now have. If the Mosbacher case we cite at page 25 of our brief says that in order to fulfill the serious question on the merits prong, we simply have to show whether – that there is a, quote, fair ground for litigation and thus a need for more deliberative investigation, I would submit on this record that that has been shown. And given that Mr. Bissett can pursue his profession in a soft – as a software implementation consultant for lots of other companies, that's undisputed, or even for SAP in a market segment other than the seven prohibited segments, the balance of the hardships, I would suggest, tips decidedly in favor of JDA, which risks losing the market advantage that this competitively valuable information provides it. And so, Your Honors, in sum, had the Court focused on the proper test as enunciated in Bedmar than the other cases cited at page 23, rather than inquiring as to whether or not we could show an actual act of competition, we submit that the Court would have concluded or should have concluded that the irreparable – the balance of hardship – excuse me – that the likelihood of success on the merits prong or alternatively the serious questions going to the merits prong would have been satisfied. That's the error of law the Court committed. And I have very little time left, but I'd like to – We'll give you a minute for a rebuttal. Thank you. Good morning, Your Honors. Thomas Hudson on behalf of the appellee, Tom Bissett. And I think at the outset I want to sort of step back and remind the Court, and as the Court knows, the context that brings us here today. We're on an appeal from a preliminary injunction, and really the issue is during the pendency of this litigation, should Mr. Bissett be put out of work until the case is resolved? Well, it's not quite that way. He has other opportunities to work, I'm sure. Well, and should he be put out of the position he's holding at SAP. That's at bottom of the injunction concerns, and of course, the Supreme Court in this Court has said that a party seeking an injunction carries a high burden. And when you look at the district court's order, it says, ultimately, it says two things that I think drive the analysis and show that it was a correct analysis. Ultimately, GADA simply failed to meet its burden on coming forward with showing what the confidential information was, what information Mr. Bissett had, how it would actually be put at risk in his new employment, and so on. And if you, what we've heard is the district court's use of the word actual competition. The district court made two findings that I think are critical to the analysis and that fit precisely with an Arizona law. The district court said expressly, I find and conclude that the interests sought to be protected by the agreement are not being compromised by Bissett's employment with SAP. And that's just after the court said there's no actual competition. Of course, we know in Arizona law, the key inquiry, what the courts look at and what the courts say is that we will not enforce a covenant not to compete that goes beyond what is necessary to protect the employer's legitimate interests. And what the district court is saying with this finding is that that's what's going on here. Precisely because there's, the interests sought to be protected are not being compromised, the covenant as written goes beyond what is necessary to protect JDA's legitimate interests. And what my opposing counsel described as actual competition is not in the order. What he said is actual competition means you have to have a disclosure or you have to have a breach. The district court understood Arizona law in an elegant way. And what, when you read the, with that phrase in context, what the district court means is, is there can't be, there's not a situation in this case where Mr. Bissett isn't in a position where the information that he acquired at JDA would be useful. He's not competing in that sense. And that has to be, that has to be the case for there to be injunctive relief. Let me just mention briefly the differences between the positions and why the district court ultimately made the findings it did. And I guess as a predicate, of course, we're here on an appeal from a preliminary injunction. And those findings by the district court are, of course, entitled to deference. And there's been no challenge or even a suggestion that those findings were clearly erroneous. And it might be that ends the inquiry. But the findings are well founded. What we heard at the preliminary injunction stage in which you see in the record are allusions to things like implementation methodologies and design templates. But there was never any articulation of what those were. And then on the other side of the evidence, you have Mr. Bissett's declaration, which makes clear he has no idea what they're talking about. And he swears under oath that he has no confidential information concerning these implementation methodologies, and that they would be absolutely no use whatsoever in his new position. And at the end of the day, the district court was left scratching its head with respect to what confidential information could possibly be at risk, and therefore, had ample discretion to make the findings it did. As explained in the briefing and as is in the record, there were several key differences between the positions. And no analogy's perfect, but it's sort of an obscure area of software implementation. And when you read these words in the record, it's at best opaque. But by way of analogy, and again, recognizing no analogy's perfect, at S, at JDA, Mr. Bissett's, Mr. Bissett's position involved principally software sales to what are called consumer goods manufacturers, companies like Procter & Gamble, who don't have retail stores themselves, but ultimately sell to retail stores. At SAP, he didn't, he stopped, he had no involvement with software sales per se, and was then ultimately dealing with retail customers who would already have an interest in SAP software, and are purchasing the software, and at that point need to purchase services to implement it, things like testing, and it's retail stores. So by way of analogy, to me it's akin to somebody who's selling, let's take the automotive industry, auto parts to General Motors for the construction of automobiles. That's sort of the low-level JDA position. And then going to Ford, and not selling auto parts, and not even selling cars, but selling warranty service contracts to individuals who've already purchased a Ford or are going to be purchasing a Ford. So what Mr. Bissett explains in his affidavit is, of course, whatever information he may have learned, and they made no showing that he actually took any trade secret or confidential information with him, but whatever he learned on the job, there's not going to be of any use in his new position. And that's why the district court found, as it did, that there was, that the confidential information, whatever was sought to be protected, was not being compromised yet. It sounds as though the judge was applying the wrong standard when he says that he's not shown that he will suffer, that it will suffer irreparable harm. Now, the standard really is the possibility, not the actuality. So he's applying the wrong standard. Well, I don't think so, Judge Fletcher. I mean, in fact, if you look at the hearing transcript of the actual hearing on the preliminary injunction standard, the district court at the outset articulates in more detail than in the order, the Ninth Circuit preliminary injunction standard. The district court understood full well what the standard was. What page do you want to point me to? It's in our supplemental excerpt of record, and it's on our supplemental excerpt of record, and it's the transcript that's towards the back. And if you look at the beginning on page, page four and five. Page which? Pages four and five of the transcript of the hearing. It says it's, he says, we'll give you 30 minutes each. You know, we all know the standard for granting and denying preliminary injunctive relief in this circuit. And it's either a showing of likelihood of success on the merits and irreparable injury, or in the alternative, a substantial question is raised and the balance of hardship plays in favor of the applying party, which the Court has described as kind of a spectrum of the old, more traditional elements for preliminary injunctive relief, which was probability of success, the harm that could be caused, and he goes on. And that is the standard of the Ninth Circuit. We have the sliding scale standard, which Judge Martone, the district court, was referring to. So I think there's no question the district court understood well the preliminary injunction standard. But he was just careless in his wording in the order? Well, what he also found was no probable success of, he found that there was not a likely chance of success on the merits, and for good reason. And of course, under the sliding scale standard, once that finding is made, the burden on irreparable harm goes up. Counsel, in the order in the second paragraph, he articulates the standard. He says the, once seeking a preliminary injunction must show either a likelihood of success on the merits and the possibility of irreparable injury. So he articulates the standard, then just shorthands it later. Oh, thank you, Judge Robinson. That's correct. I mean, I think there's no question that the judge understood the standard. And ultimately, on the sliding scale, once you fail to show the likelihood of success, the probability of harm goes up increasingly. And I guess I'd just close by going back to the findings the district court made, which fit perfectly within Arizona law. And there being a complete absence of any showing that those findings, there was not even a suggestion that those findings were clearly erroneous. And of course, in the preliminary injunction, on review of our preliminary injunction, substantial deference needs to be given to the district court's findings. So unless the Court has further questions on any of these issues, I'll sit down. It appears not. One minute for rebuttal. Thank you, Your Honor. Let me start out by suggesting that the record is clear that contrary to what counsel said, Mr. Bissett was quite familiar with the information that is at issue here. Specifically, at excerpt of Record 13, Exhibit 13, Exhibit 4, Mr. Bissett sends  out this e-mail within days prior to leaving JDA. He says, I can assure you that this level of testing, and he's talking about testing for implementation services. I can assure you that this level of testing differentiates us from our consulting competition, no matter what they might say. It's hard in the face of that e-mail that he sent to someone just days before he left to imagine that he does not know the JDA implementation methodology. The other point I want to make very quickly in the time remaining is the automobile example is a perfect example of what I'm talking about here, because it highlights the difference between the circumstance that counsel illustrated or alluded to and what's happening here. The critical inquiry here is what, from the customer's standpoint, is what software will I buy? Will I buy JDA software or will I buy SAP software? And as Mr. Bissett says in his declaration, in this hotly competitive industry, JDA's competitive advantage and its reputation in the industry is to this effect, is that it can install that software, it can implement that software quicker and cheaper than its competitors. Now, if somebody is thinking about buying a software product, one of the things that person is going to think about is who will get this to market quicker. That's exactly what Mr. Bissett says. Mr. Bissett is working as a software implementation consultant for SAP. He knows how JDA implements the software. If he shares with SAP, as in this position, he is likely to do, how JDA implements the software. When that customer is facing SAP software, JDA software, which product do I buy? And SAP has now closed the gap between JDA's ability to get that software online quicker and cheaper, or maybe even eliminated it by virtue of Mr. Bissett as a software consulting manager, disclosing that information to SAP, or using what he knows from his tenure at JDA to close that gap. The advantage JDA has in that marketplace to sell that software on a competitive basis with SAP software is diminished, if not entirely. All right. Counsel, we understand. Thank you. Thank you to both counsel. The case, as argued, is submitted for decision by the court. The final case on
judges: Fletcher, Canby, Rawlinson